[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 26, 2003
THOMAS K. KAHN
CLERK

No. 02-11011

D. C. Docket No. 01-00171 CR-N-W

UNITED STATES OF AMERICA,

Plaintiff-Appellee,
Cross-Appellant,

versus

PHILIP K. BOBO,

Defendant-Appellant-
Cross-Appellee.

Appeals from the United States District Court
for the Northern District of Alabama

**(August 26, 2003)**

Before DUBINA and FAY, Circuit Judges, and DOWD*, District Judge.

---

*Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

DUBINA, Circuit Judge:

Appellant Dr. Philip Bobo appeals his convictions for conspiracy to defraud the United States and any health care benefit program, in violation of 18 U.S.C. §§ 371, 1347(1), and attempting to defraud any health care benefit program, in violation of 18 U.S.C. § 1347(1).  On appeal, Dr. Bobo asserts numerous grounds of error, but we find one issue dispositive: whether the district court erred by denying Dr. Bobo's motion to dismiss the indictment because the conduct alleged in the indictment was legally insufficient to support Dr. Bobo's conviction for health care fraud.  Because we conclude that the district court erred in failing to dismiss the indictment, we decline to address the other issues raised on appeal.[1] For the reasons that follow, we reverse the district court's order denying Dr. Bobo's motion to dismiss the indictment and vacate Dr. Bobo's convictions.

---

[1] Dr. Bobo also asserts on appeal that insufficient evidence existed to convict him of the charged offenses; that material variances existed between the indictment and the evidence adduced at trial; that the district court was biased against him and denied him a fair trial; that the district court's instruction on "reasonable doubt" was incorrect; and that the district court erred at sentencing by miscalculating the loss incurred as a result of the fraud, by finding that Dr. Bobo abused a position of public trust, and by denying Dr. Bobo's request for a downward departure.  The government cross-appeals numerous issues: whether the district court erred in determining that it was unable to enhance Dr. Bobo's sentence for minimal planning and abuse of public trust because it constituted double-counting; whether the district court erred in finding that the conspiracy scheme was incomplete and granting Dr. Bobo a three-point reduction in his offense level; whether the district court erred by concluding that Dr. Bobo was not a leader or manager of the scheme to defraud; and whether the district court erred in finding that Dr. Bobo had not obstructed justice.

# I. BACKGROUND

## A. *Procedural History*

A federal grand jury indicted Dr. Bobo for conspiracy to defraud the United States and a health care benefit program, in violation of 18 U.S.C. §§ 371, 1347(1) (Count I); attempt to defraud a health care benefit program, in violation of 18 U.S.C. § 1347(1) (Count II); and committing wire fraud, in violation of 18 U.S.C. § 1343 (Count III).  Dr. Bobo pled not guilty and moved to dismiss the indictment. The district court denied Dr. Bobo's motion to dismiss Counts I and II, but granted the motion as to Count III.[2]  The case proceeded to trial, and a jury found Dr. Bobo guilty of conspiracy to defraud a health care benefit program and attempt to defraud a health care benefit program.  Following a sentencing hearing, the district court sentenced Dr. Bobo to 27 months imprisonment on the two counts, to be served concurrently, followed by three years supervised release, and imposed a $60,000 fine.

## B. *Facts*

<u>Dr. Bobo and Neighborhood Health Services</u>

---

[2]  The district court dismissed the wire fraud count because the indictment failed to name the person who allegedly committed the wire fraud.

Dr. Bobo has been a board-certified emergency room/trauma physician since 1973, working primarily at Druid City Hospital in Tuscaloosa, Alabama. He also served as medical director of the Alabama Fire College, where he trained firemen and paramedics in emergency medical services. Governor Don Siegelman appointed Dr. Bobo State Emergency Medical Director, and Dr. Bobo served on Governor Siegelman's transition team from November 1998 to January 1999. Dr. Bobo also held other medical-related positions, including physician for the University of Alabama football team, and plant physician at Uniroyal Goodrich. In addition, Dr. Bobo founded Emergicare, a seven-day clinic where patients do not need appointments in order to see a doctor.

In the 1980's, Dr. Bobo and three other doctors, pediatrician Dr. Phil Phillips, general surgeon Dr. Charles Rose, and obstetrician and gynecologist Dr. Karl Harbin created Neighborhood Health Services ("NHS"), a limited liability corporation. The doctors formed NHS to provide primary medical care to patients who would otherwise be forced to use the emergency room. Dr. Bobo and attorney Boolis Boohaker are the administrators of NHS. Dr. Bobo serves as managing partner and owns 51 percent of NHS. Mary Jo Looser, former administrator of the maternity waiver program for the health department in a five county area, serves as executive program director of NHS. NHS has two other

employees, Charlotte Jamison, care coordinator director, and Dr. Pat Lagrone, director of quality assurance.

The Medicaid Maternity Waiver Program

Ms. Gwendolyn Williams, Commissioner of the Alabama Medicaid Agency from 1995-1999, testified at Dr. Bobo's trial that Congress created the Maternity Care Program ("MCP") in 1997 to address Alabama's high infant mortality rate and low level rate of prenatal care. The MCP's purpose was to ensure comprehensive medical services to pregnant women on medicaid, beginning with prenatal treatment and following mother and child through the postpartum stage.

Ms. Williams worked with federal agencies to construct a special maternity medicaid program labeled a "waiver program" because it requires the patient to waive mandated medicaid requirements such as "freedom of choice." The program, entitled Maternity Waiver Program ("MWP"), waives certain medicaid requirements in exchange for an established network of services, specific doctors, hospitals, and other medical providers. Under the program, the expectant mother has a case manager who functions as an overseer of the mother's medical treatment. Ms. Williams worked with the Alabama Medicaid Agency to increase reimbursement rates and also worked with the Department of Health and other

5

agencies to establish a solid network of providers. After initial tests in a few counties, the program expanded statewide.

Under the MWP, the Alabama Medicaid Agency divided the state of Alabama into 13 districts. The districts at issue in this case are District 4, which consists of Lamar, Fayette, Pickens, Tuscaloosa, and Bibb counties, and District 7, which consists of Green and Hale counties. Entities within each district wishing to provide MWP services bid competitively to offer a complete package of benefits including prenatal visits, delivery, postpartum medical care, and case management. Ms. Williams testified that approximately 70 percent of the funding for the program comes from the federal government via the United States Department of Health and Human Services, with the remaining 30 percent of funding provided by the State. The initial statewide budget to finance the MWP was $100,000,000.

Ms. Williams Association with Dr. Bobo

Ms. Williams testified that she first met Dr. Bobo in early 1998, when he expressed an interest in the MWP. After that first meeting, Ms. Williams stated that Dr. Bobo called her almost weekly, offering suggestions about the MWP. Ms. Williams testified that Dr. Bobo's calls became increasingly hostile, so that she ultimately refused to accept his calls. In July 1998, however, Ms. Williams met

6

with Dr. Bobo to discuss whether the MWP would use requests for proposals ("RFP") or invitations to bid ("ITB") to seek potential providers. Dr. Bobo requested that the MWP use the RFPs because then price would not be the sole determining factor that the agency would consider in awarding the contracts. Dr. Bobo also relayed his concerns over the length of the process and the delays in awarding the contracts. Ms. Williams responded that she did not have the authority under state law to use only RFPs.

Consequently, in October 1998, the agency released the ITBs. This program requires the bidders to provide detailed documentation regarding access to care, participating hospitals, average care time devoted to each patient, and other pertinent information. The bidders provided this information via contracts or signed letters of intent. NHS submitted bids for most of the districts.

The Bidding Process

Ms. Vicki Huff, former Alabama Medicaid Agency Director of Medical Services, testified that her office prepared the 1998 ITBs. She stated that the agency received bids with a bid price that represented the service provider's estimated cost per birth. The two original bidders in District 4 were NHS and Alabama Health Network ("AHN"), a coalition composed of Druid City Regional Health Authority, Bibb County Medical Center, Pickens County Medical Center,

7

West Alabama Health Network, and members from the Capstone Health Services Foundation. AHN is a consortium of hospitals and clinics created specifically to bid on contracts. For District 4, NHS bid $4,260 and AHN bid $3,889 to provide services under the MWP. The bid price represented the cost to deliver one child, including comprehensive prenatal care, education, and postpartum care. After the agency evaluated the ITBs, State Finance Director, Dr. Henry C. Mabry, III, notified NHS that it had received the contract for District 4.

As to District 7, of the three bidders, NHS, AHN, and Tombigbee Health Care Authority, NHS's bid was the highest, totaling $4,516 per delivery compared to AHN's bid of $3,949 per delivery. The State awarded District 7 to AHN.

On March 19, 1999, Dr. Mabry distributed a letter to all the bidders identifying the "preliminary" winning bids. This letter identified NHS as the MWP recipient for Districts 1, 4, and 9.[3] On May 13, 1999, Bill Newton, the acting purchasing director for the Alabama Department of Finance, notified NHS and AHN that all bids received for District 4 had been cancelled and District 4 would have to be rebid due to irregularities in the bid process. Newton informed NHS that the agency would ask for rebids at a later date.

---

[3] Ms. Huff testified that later it became apparent that NHS did not demonstrate to the Alabama Medicaid Agency that it had an adequate provider network for Districts 1 or 4; hence, the State withdrew NHS's receipt of the contracts for those two districts.

On June 4, 1999, AHN filed a lawsuit protesting the rebid. AHN and the State Medicaid Agency and the State Finance Department settled the lawsuit. NHS did not submit a second bid for District 4. The State then awarded District 4 to AHN.

Conduct at Issue

Ms. Pam Parsons, an assistant vice-president for development at the University of Alabama, testified that Dr. Bobo contacted her around May 11, 1999, regarding Capstone Medical Center ("Capstone"), a physician residency program within the University of Alabama's College of Community Health Sciences. Dr. Bobo requested that Ms. Parsons relay information to the University's President, Dr. Andrew Sorenson, and to the associate dean for clinical affairs at the College of Community Health Sciences, Dr. Marc Armstrong. The information Dr. Bobo requested Ms. Parsons to "pass along" was that NHS would pay $800,000 to the University via Capstone if AHN would withdraw its bid for District 7 and its re-bid for District 4. Dr. Bobo would get part of this money from the Fire College and NHS would pay the remainder. In exchange, Dr. Bobo would guarantee admissions to Capstone and contract with Capstone to have residents serve as first aid station attendants during Alabama football games. When Ms. Parsons contacted Dr. Sorenson, he informed her that the University would not be

9

involved in the bidding process. On cross-examination, Ms. Parsons stated that during her state grand jury testimony in July 1999, she testified that Bill Jones, the University of Alabama's Director of Governmental Relations and Chief Lobbyist, called Dr. Bobo's statements "negotiations," and commented to her that they were not unusual.

Dr. Armstrong testified that in addition to his work at the College of Community Health Sciences, he worked with Capstone training residents. He stated that he was a member of the board of directors at Capstone Health Services Foundation, a member of AHN, but acknowledged that he had no position or authority with AHN. Dr. Armstrong testified that Dr. Bobo and Ms. Parsons each telephoned him twice regarding the bidding process for the MWP. In Dr. Armstrong's first conversation with Dr. Bobo, Dr. Bobo represented that NHS would win the re-bid for District 4 because of assurances from the Governor. Dr. Bobo told Dr. Armstrong that if AHN did not re-bid for District 4, Dr. Bobo would arrange for the College of Community Health Sciences to receive $550,000 per year from the Fire College to lecture the emergency medical trainees and provide residents to administer first aid at Alabama football games. Dr. Bobo also stated that he would pay $250,000 for Capstone to take care of NHS's medicaid inpatients.

Dr. Armstrong also testified that he was troubled by Dr. Bobo's offer and even thought Dr. Bobo was asking him to participate in a crime. Therefore, he contacted his boss, Dean Bill Curry of the Alabama School of Medicine, and Capstone's business manager, John Maxwell. Dr. Curry recommended that Dr. Armstrong put the substance of Dr. Bobo's call in writing and contact AHN's attorney. AHN's attorney instructed Dr. Armstrong to tape record any conversation with Dr. Bobo. Dr. Armstrong further testified that Ms. Parsons contacted him the day after he first spoke with Dr. Bobo, indicating that she was supportive of Dr. Bobo's offer and asking Dr. Armstrong if she could do anything to help consummate the deal. AHN's attorney also recommended that Dr. Armstrong tape record any further conversations with Ms. Parsons.

In a May 18, 1999, telephone conversation with Dr. Armstrong, Dr. Bobo mentioned that NHS was a good business and that he had good people to run it. Dr. Bobo informed Dr. Armstrong that the deal was an ideal way to help Capstone's program with its funding difficulties. Dr. Bobo mentioned that no strings were attached except what they had talked about the other day. He stated that NHS would "do contracts" and work for Capstone, and he also stated that this offer was not a bribe, but purely a business proposition.

In a subsequent telephone conversation with Ms. Parsons, Dr. Armstrong stated Dr. Bobo's offer clearly: we're getting $800,000 from Dr. Bobo, $550,000 from the Fire College and $250,000 from NHS. Dr. Armstrong told Ms. Parsons that although he was not publicly involved with AHN, Dr. Bobo contacted him because he and Dr. Bobo have a good relationship. Ms. Parsons admitted that Dr. Sorenson understood Dr. Bobo's offer to mean that the University would receive $800,000 or nothing.

At Dr. Bobo's trial, Mr. Maxwell testified that he was President of AHN, but received compensation from the University for his work at Capstone and from Capstone Health Services Foundation. Mr. Maxwell testified that during his conversation with Dr. Bobo, Dr. Bobo indicated that he would do all he could to keep up the number of deliveries "within the bounds of the law." Mr. Maxwell also stated that no bid was in effect for District 4 when he spoke with Dr. Bobo a second time, at or near the end of May.

In a May 27, 1999, telephone phone conversation with Mr. Maxwell, Dr. Bobo stated that he had made an offer that was good for everybody. Dr. Bobo mentioned that he needed District 4 as his "home base" because NHS had received the bids for several surrounding districts. Dr. Bobo informed Mr. Maxwell that "we may do it all through the Fire College . . . I managed to get some additional

12

funds put in the Fire College with the blessings of the administration. . . . We would like to contract with some existing programs, rural health, etc., . . . we do an institution exchange." After repeating the offer that he had made to Dr. Armstrong, Dr. Bobo stated that they needed to see where else they could plug programs to make contracts work to total the offered amount.

In a subsequent telephone conversation with Mr. Maxwell on June 1, 1999, Dr. Bobo encouraged Mr. Maxwell to "do some convincing." Dr. Bobo assured Mr. Maxwell that he would get $800,000 in pocket, and that it would not be a one time deal, but would occur every year. Dr. Bobo stated that NHS would get the bid because Dr. Bobo could afford to go low on the price due to the contracts he allegedly had. Dr. Bobo commented that he would give Capstone some money every year and keep the residents busy. Mr. Maxwell responded that it made a lot of sense to him, and as far as he was concerned, they had a deal.

Dr. Karl Harbin, a partner with NHS, testified that he understood that the agency would not select the entity solely based on price, but would consider the entity who best met all the requirements. Dr. Harbin did not participate in the bid process, but did discuss it with Dr. Bobo. Dr. Harbin stated that, in one of his conversations with Dr. Bobo, Dr. Bobo mentioned his discussions with Dr. Armstrong and Mr. Maxwell. Dr. Bobo told Dr. Harbin that these individuals

13

were thinking of not bidding on the program because they thought NHS had the best program, and that they were concerned about the Capstone's financial situation. Dr. Bobo told Dr. Harbin that he had assured Dr. Armstrong and Mr. Maxwell that with his political connections, he could obtain some funding from the legislature for Capstone, similar to the institution exchange in which the University of Alabama at Birmingham ("UAB") participates.

Dr. Harbin further testified that Dr. Bobo threatened, in no uncertain terms, that if Dr. Bobo obtained the funding for Capstone, AHN should not re-bid on District 4. Dr. Bobo asked Dr. Harbin to call Dr. Curry and others about his offer. Dr. Bobo called Dr. Harbin late one night informing him that a "Nick" from Montgomery had flown to Tuscaloosa to discuss the MWP bids with Dr. Bobo. Dr. Harbin stated that when he discussed this information with an FBI agent, he told the agent that "Nick" had a projected budget below which NHS should bid and "Nick" had provided this figure to Dr. Bobo. Dr. Harbin estimated that this meeting between "Nick" and Dr. Bobo occurred around May of 1999.

Dr. Bobo's Trial Testimony

Dr. Bobo testified at trial and denied all charges, stating that he believed in good faith that he had a right to do what he did. Dr. Bobo testified that he spoke to Dr. Armstrong only about Capstone, not AHN. Dr. Bobo stated that he viewed

14

NHS as a means to provide quality medical services for indigent pregnant women, but that he also hoped to recoup his investment and make money from the program. Dr. Bobo testified that he had encouraged Dr. Armstrong to talk with everyone about the offer. Dr. Bobo explained that he did not want the proposed arrangement with the Fire College disclosed, not because he thought it was illegal, but because he had not worked out the details. Dr. Bobo stated unequivocally that he was not trying to prevent anyone from being a provider; rather, he was negotiating an agreement between providers.

## II. STANDARD OF REVIEW

"We review the district court's denial of a motion to dismiss the indictment for abuse of discretion, but the sufficiency of an indictment is a legal question that we review de novo." *United States v. Pendergraft*, 297 F.3d 1198, 1204 (11th Cir. 2002) (internal citation omitted).

## III. DISCUSSION

For an indictment to be valid, it must "contain[] the elements of the offense intended to be charged, and sufficiently apprise[] the defendant of what he must be prepared to meet." *Russell v. United States*, 369 U.S. 749, 763, 82 S. Ct. 1038,

15

1047, 8 L. Ed. 2d 240 (1962) (internal quotations omitted); *United States v. Sanchez*, 269 F.3d 1250, 1314 (11th Cir. 2001) (*en banc*), *cert. denied*, 535 U.S. 942, 122 S. Ct. 1327, 152 L. Ed. 2d 234 (2002). "An indictment not framed to apprise the defendant with reasonable certainty, of the nature of the accusation against him is defective, although it may follow the language of the statute." *Russell*, 369 U.S. at 765, 82 S. Ct. at 1047 (internal quotations and citations omitted). Furthermore, if the indictment tracks the language of the statute, "it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Id.* at 765, 82 S. Ct. at 1048; *see also Hamling v. United States*, 418 U.S. 87, 117-18, 94 S. Ct. 2887, 2907-08, 41 L. Ed. 2d 590 (1974). When the indictment uses generic terms, it must state the offense with particularity. *Russell*, 369 U.S. at 765, 82 S. Ct. at 1047. Additionally, an indictment must enable the defendant to enter a plea that will bar any "future prosecutions for the same offense." *Hamling*, 418 U.S. at 117, 94 S. Ct. at 2907.

The indictment in this case[4] alleges that the Alabama Medicaid Agency set the deadline for the MWP bid process at March 29, 1999, and that NHS and AHN participated in the MWP program by submitting bids. In describing Dr.

---

[4]We have attached the indictment as an appendix to this opinion.

16

Armstrong and AHN, the indictment states that "Dr. Armstrong and several of his associates and acquaintances formed the Alabama Health Network ("AHN") which is made up of Druid City Hospital Regional Health Authority, Bibb County Medical Center, Pickens County Medical Center, West Alabama Health Network, and members from Capstone Health Services Foundation." [R. Vol. 1, Doc. 1]. The indictment further states that, after receiving bids for District 4, the agency sent a letter to AHN informing it that District 4 was to be rebid due to confusion in the bidding process, and the agency reset the deadline for June 21, 1999. *See id.*

> Count I of the indictment charges that Dr. Bobo
>
> did unlawfully, willfully, and knowingly combine, conspire, confederate and agree [with others known and unknown] to . . . knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, that is, the Maternity Care Program being administered by the Alabama Medicaid Agency, and financed by the Health Care Financing Administration of the United States Department of Health and Human Services and the state of Alabama, in violation of Title 18, United States Code, Section 1347(1). [R. Vol. 1, Doc. 1].

In support of this count, under "manner and means," the government alleges that Dr. Bobo offered to pay AHN $800,000 for each year of the MWP if it would refrain from submitting a rebid on District 4 and give up its contract in District 7, and that this offer was part of the scheme and artifice to defraud. *See id.* The indictment lists the overt acts as the telephone calls Dr. Bobo made to Dr.

17

Armstrong and Mr. Maxwell and the call that the unindicted co-conspirator made to Dr. Armstrong regarding Dr. Bobo's offer.

In Count II, the indictment incorporates the information supporting Count I and charges that Dr. Bobo

> did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefits program, that is the Maternity Care Program, operated by the Alabama Medicaid Agency and financed by the Health Care Financing Administration of the United States Department of Health and Human Services and the state of Alabama, in violation of Title 18, United States Code, Section 1347(1).  *See id.*

The indictment does not set forth the manner and means by which the scheme and artifice to defraud operated, except to incorporate the manner and means supporting the conspiracy count.   The indictment also does not contain the remaining language of the statute which provides, in part, that the fraud must be "in connection with the delivery of or payment for health care benefits, items, or services." *See* 18 U.S.C. § 1347(1).

Typically, an indictment sets forth what the scheme was designed to deprive the victim "of "and then describes by what means the scheme was designed to be accomplished.  *See, e.g., Belt v. United States*, 868 F.2d 1208, 1211 (11th Cir. 1989); *United States v. Dynalectric Co.*, 859 F.2d 1559, 1572 (11th Cir. 1988) (noting that a mail fraud indictment charged defendants with conspiring to devise

a scheme and artifice to defraud the victim of money and their right to free and open competition in the bidding process). Here, the underlying statute, 18 U.S.C. § 1347(1) refers to fraud in connection with the delivery or payment of "health care benefits, items or services." Not only does the indictment fail to mention a fraud in connection with the delivery or payment of health care benefits, items, or services in Counts I and II, but it also fails to specify of what precisely Dr. Bobo was allegedly trying to defraud the MWP program: benefits, items, services, or money. The benefits, items, or services *could have been* the difference in the bids from the prior round of bids between AHN and NHS, as the government contended at trial. Alternatively, the benefits, items, or services *could have been* the money that Dr. Bobo proposed he would get from the legislature for Capstone. However, the indictment makes only a broad allegation of fraud in a health care benefit program without the required specificity. An indictment that requires speculation on a fundamental part of the charge is insufficient. *See Hamling*, 418 U.S. at 117, 94 S. Ct. at 2907.

Furthermore, the indictment does not specify the scheme or artifice to defraud with which the government was charging Dr. Bobo. The indictment contains no indication of what the government contended was unlawful about Dr. Bobo's conduct. At various times throughout the trial, the government mentioned

19

Dr. Bobo's "offer" of $800,000 as a "bribe" or as part of a "bid rigging" scheme. However, the government made no mention in the indictment of a federal statute which prohibits the type of conduct alleged here. *See, e.g., Dynalectric Co.*, 859 F.2d at 1572 n.17. Even if the government mentioned "bribe" in the indictment, no evidence exists to support such an allegation. Dr. Bobo did not offer a "bribe" to a competing bidder. The alleged "bribe" was made to Dr. Armstrong, who testified that he had no authority over the competitor, AHN.[5] *See* WEBSTER'S THIRD INTERNAT'L DICTIONARY (1986) (defining bribe as "a price, reward, gift or favor bestowed or promised with a view to pervert the judgment or corrupt the conduct esp. of a person in a position of trust"). The government did not state in the indictment that Dr. Bobo's offer of $800,000 to Capstone for its residents to work the first aid station at football games and for it to provide care for some of his medicaid patients is a crime under the health care fraud statute.

Likewise, the indictment did not charge a violation of Alabama law. Alabama has no requirement that professional service contracts be competitively bid. *See* Ala. Code § 41-16-51(a)(3) (2000). The indictment also contained no allegation that Dr. Bobo's conduct would violate the rules of the bid process, even

---

[5] The indictment alleges that Dr. Armstrong helped form AHN, but Dr. Armstrong testified that he had no authority or control over AHN. [R. Vol. 6, p. 422].

if a bid process were pending at the time.[6]  Even if the new bid process had required competitive bidding, no allegation exists that, in the absence of the alleged scheme, the MWP would have paid a lower price or received a better quality program.  *See e.g., McNally v. United States*, 483 U.S. 350, 107 S. Ct. 2875, 97 L. Ed. 2d 292 (1987) (indictment alleged mail fraud).  Furthermore, there is no allegation in the indictment that any future rebid by NHS would in any way adversely affect the MWP.

Because the government incorporated the paragraphs from Count I of the indictment in Count II, the jury may have believed that the overt acts alleged to support the conspiracy charge were sufficient to describe the alleged scheme or artifice to defraud.  However, we have held that the overt acts are to support the charge of conspiracy, "not to describe an alleged scheme to defraud." *United States v. Adkinson*, 135 F.3d 1363, 1377 (11th Cir. 1998).  Even if overt acts could

---

[6] We express serious doubt whether a bid process was pending at the time Dr. Bobo made his "offer" to Dr. Armstrong and Mr. Maxwell.  Mr. Maxwell testified that when he discussed the offer with Dr. Bobo, no bid process was pending. [R. Vol. 6, p. 614-15].  Additionally, the documents submitted at trial indicate that the agency cancelled the ITBs for District 4 and the agency returned all bids to the vendor.  Furthermore, the documents do not contain any indication that the agency reset a rebid date.  *See* Def. Exh. 6, 7, & 8 (letter from Dale Walley, Acting Alabama Medicaid Commissioner, to Bill Newton, Acting Purchasing Director, Alabama Department of Finance; letter from Bill Newton to NHS; and letter from Bill Newton to AHN).  AHN's complaint in Montgomery County Circuit Court protesting the bid mentions a rebid date.  *See* Def. Exh. 13, p. 6 (stating that by letter dated May 27, 1999, Medicaid mailed to AHN a copy of the ITB constituting the rebid for District 4.  The rebid ITB stated that the bid must be received before June 21, 1999).

describe the scheme or artifice to defraud, they fail in this case. Overt act (b) alleges that Dr. Bobo offered the $800,000 to Capstone, not AHN as the government alleges in the "manner and means" paragraph supporting Count I. Thus, we cannot merely assume that the jury unanimously agreed on *which* overt acts. *See United States v. Gipson*, 553 F.2d 453, 457-58 (5th Cir. 1977).[7] The failure of the jury to unanimously agree on which overt act constitutes the "scheme" deprives Dr. Bobo of the right to a unanimous verdict. *See id.*

Due to the inadequacies in the indictment, we cannot discern what scheme the jury found Dr. Bobo had committed. Hence, Count II cannot stand. Where the scheme to defraud alleged in the substantive count is not sufficient to state an offense, then a conspiracy count based upon the charge must also be found deficient. *See McNally*, 483 U.S. at 361, 107 S. Ct. at 2882. Thus, Count I also fails. Accordingly, we conclude that the district court erred in failing to dismiss the indictment because it does not state an offense under the health care fraud statute, and thus, as a matter of law, is deficient.[8]

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[8] The district court adopted the magistrate judge's findings and conclusions on Dr. Bobo's motion to dismiss the indictment. Contrary to the indictment, the magistrate judge incorrectly found that Dr. Bobo's "scheme" was to win the contract with a higher bid. [R. Vol. 1, Doc. 45]. Further, the magistrate judge erred in finding that the government's allegations were sufficient to support the charge under subsection (2) of 18 U.S.C. § 1347. The indictment charges Dr. Bobo with a violation

## IV. CONCLUSION

Although we do not condone Dr. Bobo's "offer," we cannot say, as a matter of law, that he violated the health care fraud statute, 18 U.S.C. § 1347(1), as alleged in the indictment. Accordingly, we reverse the district court's denial of Dr. Bobo's motion to dismiss the indictment and vacate Dr. Bobo's convictions.[9]

REVERSED and VACATED.

---

of subsection (1) only.

[9]Even if we assume that the district court properly denied the motion to dismiss the indictment, we would still be compelled to vacate Dr. Bobo's convictions on other grounds. For example, we seriously question whether the evidence presented was sufficient to support the convictions and it appears there was a material variance between the indictment and the evidence presented at trial. Furthermore, we have concerns about some of the district court's rulings and actions taken during the course of the trial and believe that the cumulative effect of these errors may have denied Dr. Bobo a fundamentally fair trial.