UNITED STATES of America,

v.

Carlos German BERDEAL, Lilliam Pastrana Berdeal, Rodolfo Julio Rego, and Carlos Seafood, Inc.

Case No. 07–20898–CR.

United States District Court,
S.D. Florida,
Miami Division.

Jan. 22, 2009.

Norman O. Hemming, III, United States Attorney's Office, Miami, FL, for Plaintiff.

David Scott Mandel, Esq., Mandel & Mandel LLP, Thomas N. McAliley, Esq., White & Case, for Defendant.

### ORDER GRANTING IN PART MOTION TO DISMISS COUNTS OF INDICTMENT

ADALBERTO JORDAN, District Judge.

For the reasons stated below, the defendants' motion to dismiss the indictment [D.E. 49] is GRANTED IN PART. Counts 2, 3, and 4 of the indictment against Carlos German Berdeal, Lilliam Pastrana Berdeal, Rodolfo Julio Rego, and Carlos Seafood, Inc. are dismissed with prejudice. Similarly, the conspiracy charges in Count 1 are dismissed with prejudice to the extent that they are based on alleged violations of § 68B–21.003(1) and § 68B–21.004(1)(a) of the Florida Administrative Code.[1]

### I. ALLEGATIONS IN THE INDICTMENT

The indictment alleges, in relevant part, that the defendants violated the Lacey Act, 16 U.S.C. § 3372(a)(2)(A), by selling frozen snook fillets imported from a foreign country, which is allegedly prohibited by § 68B–21.003(1), § 68B–21.004(1)(a) of the Florida Administrative Code.[2] The indictment, in the background section and in Count 1, alleges that the snook came from Nicaragua.[3]

---

1. The defendants' motion to dismiss the remaining charges is addressed in a separate order.

2. The Fish and Wildlife Conservation Commission ("FWCC") enacted §§ 68B–21.003(1) and 68B–21.004(1)(a) pursuant to Article 4, § 9 of the Florida Constitution.

3. The parties agree, moreover, that the snook at issue were from Nicaragua.

In Count 2, the government alleges that on January 15, 2003, the defendants sold approximately 30 cases of snook, valued at $4,800.00. Count 3 is based on the alleged sale of 340 cases of snook worth $54,400.00 on December 16, 2006, and Count 4 is based on the alleged sale of 70 cases of snook on January 29, 2004, with a value of $11,200.00.

## II. STANDARD

A motion to dismiss in criminal case is limited to the four corners of the indictment. *See United States v. Salman,* 378 F.3d 1266, 1268 (11th Cir.2004). The indictment's allegations are assumed to be true and are viewed in the light most favorable to the government. *See United States v. Torkington,* 812 F.2d 1347, 1354 (11th Cir.1987). A motion to dismiss is not a device for a summary trial of the evidence. *See, e.g., Salman,* 378 F.3d at 1268–69; *United States v. Critzer,* 951 F.2d 306, 307 (11th Cir.1992). But an indictment fails as a matter of law if the defendants' charged conduct, even if true, does not violate the statute or provision cited in the indictment. *See, e.g., United States v. Madera,* 528 F.3d 852, 859 (11th Cir.2008) (dismissing indictment because defendant's conduct did not violate charged statute); *United States v. Bobo,* 344 F.3d 1076, 1086 (11th Cir.2003) (reversing denial of motion to dismiss because the alleged conduct did not violate the statute charged in the indictment).

## III. DISCUSSION

The Lacey Act prohibits, among other things, the importation and sale in interstate or foreign commerce of any fish in violation of any state or foreign law. *See* 16 U.S.C. § 3372(a)(2)(A). To prevail in a Lacey Act prosecution, therefore, the government must prove an underlying violation of state or foreign law. *See United States v. McNab,* 331 F.3d 1228, 1241, 1247 (11th Cir.2003). The underlying foreign or state law defines what constitutes illegal conduct. *See id.* at 1241. "Consequently [the Lacey Act] is 'not violated if the state law is not violated.'" *United States v. Miller,* 981 F.2d 439, 442 (9th Cir.1992). As explained below, all Lacey Act charges based on purported violations of §§ 68B–21.003(1) and 68B–21.004(1)(a) fail to state a claim against the defendants because these provisions of the Florida Administrative Code do not apply to snook caught outside of Florida.

The indictment alleges that the defendants violated §§ 68B–21.003(1) and 68B–21.004(1)(a) by importing and selling snook caught or taken in Nicaragua. The defendants do not dispute the indictment's factual allegations but argue that the Lacey Act charges fail as a matter of law because neither § 68B–21.003(1) nor § 68B–21.004(1)(a) apply to snook caught outside of Florida. I agree.

Whether § 68B–21.003(1) and § 68B–21.004(1)(a) apply to fish caught outside of Florida is a question of Florida law. *See Johnson v. Fankell,* 520 U.S. 911, 916, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997) ("neither this Court nor any federal tribunal has any authority to place a construction in a state statute different from the one rendered by the highest court of that state"); *Cotton States Mut. Ins. Co. v. J.O. Anderson,* 749 F.2d 663, 667 (11th Cir. 1984) (state courts have the inherent power "to construe their own statutes and federal courts are bound by that state interpretation").

There are no Florida cases on whether §§ 68B–21.003(1) and 68B–21.004(1)(a) apply to fish caught outside of Florida. But the Florida Supreme Court has made clear that, absent express language stating explicitly the application of the law to fish caught extraterritorially, Florida fishing regulations apply only to fish taken from Florida waters.

This principle dates back to 1927, when the Florida Supreme Court reversed a conviction for possession in Florida of mullet that had been legally caught in Alabama waters. *See White v. State*, 93 Fla. 905, 113 So. 94, 95 (1927). The statute at issue in *White* prohibited the possession, purchase, or sale of mullet of less than 12 inches in length:

Section 1 of the act declares it to be unlawful for any person to take, have in his 'possession, buy, sell, or offer for sale at any time, or unnecessarily destroy any of the fish known' as mullet, of less than 12 inches from tip of nose to fork of tail: 'Provided, that mullet of ten inches can be taken in the waters at points located west of Aucilla river to the Alabama line, provided, that silver mullet of a less length than twelve inches may be caught and possessed during the open season.'

113 So. at 94–95. The Florida Supreme Court set out a two-prong test to determine whether a person could be convicted under Florida law for possessing fish caught outside of Florida. The first question is "whether it was *clearly* the purpose of the statute to include fish that were imported as an article of commerce from another state." *See id.* at 95 (emphasis added). If this is the purpose of the statute, then the court needs to determine whether such regulation of fish imported from other state unduly interferes with interstate commerce. *Id.* Applying this test to the mullet statute, the Florida Supreme Court concluded in *White* that the conviction failed under the first prong because "nowhere in any of its provisions is the purpose at all clear that they should include fish or game taken in another jurisdiction." *Id.* at 95. It reversed the conviction to allow the defendant to present evidence that the fish had been caught outside of Florida. *See id.*

The Florida Supreme Court reaffirmed this principle three years later in *Taylor v. Penton*, 99 Fla. 1067, 128 So. 499 (1930):

Some courts have adopted the rule that a statute like the one under review can have no application to fish taken in another state unless made so by express language, while other courts hold that the penalty for taking, having in possession, or selling game or fish applies to all game or fish whether domestic or foreign ... This court is committed to the former rule ... The reason for the rule being that such statutes are penal and should punish only those acts which are specifically condemned.

*Id.* at 499–500 (internal citations omitted).

In *State v. Millington*, 377 So.2d 685, 687 (Fla.1979), the Florida Supreme Court again applied this principle to conclude that Fla. Stat. § 370.15(2)(a)—which prohibited the possession of "small shrimp"—applied to shrimp caught outside of Florida. In relevant part, § 370.15(2)(a) made it "unlawful for any person, firm, or corporation to catch, kill, or destroy shrimp or prawn *within or without* the waters of this state ..." (emphasis added). The Florida Supreme Court reasoned that "from the words of the statute alone, it is clear that the legislature intended the prohibition against possession of 'small shrimp' to apply to shrimp taken 'within or without the waters of this state.'" *See Millington*, 377 So.2d at 687. The clear legislative intent to have § 370.15(2)(a) apply outside of Florida distinguished the statute in *Millington* from the one in *White*. *See id.*

The presumption that Florida fishing regulations do not apply to fish caught outside of Florida in the absence of clear legislative intent is consistent with other Florida cases refusing to imply the extraterritorial application of other Florida statutes. *See Burns v. Rozen*, 201 So.2d 629, 630–31 (Fla. 1st DCA 1967) ("Extraterrito-

rial effect of an enactment is not to be found by implication."). *See also Se. Fisheries Assoc., Inc. v. Dep't of Natural Res.*, 453 So.2d 1351, 1355 (Fla.1984) (refusing to imply extraterritorial application of statute prohibiting the use of specified fish traps); *Boehner v. McDermott*, 332 F.Supp.2d 149, 155 (D.D.C.2004) ("Florida courts have consistently declined to apply Florida law outside territorial boundaries unless a statute contains an 'express intention that its provisions are to be given extraterritorial effect.' ")

As noted earlier, the snook at issue were caught or taken in Nicaragua, and there is no allegation that this was done in violation of Nicaraguan law. The determinative question in this case, therefore, is whether §§ 68B–21.003(1) and 68B–21.004(1)(a) of the Florida Administrative Code expressly apply to snook caught outside of Florida.

### A. § 68B–21.003(1)

Under § 68B–21.003(1), it is unlawful

> for any person, firm or corporation to buy, sell, trade, barter or exchange snook in any form or manner, or to receive anything of value for any snook with or without changing possession thereof, except as provided in Rule 68B–8.012, F.A.C.

Nothing in the text of § 68B–21.003(1) suggests that it is intended to apply to snook caught outside of Florida waters. On the contrary, the reference to § 68B–8.012—a rule designed in part to preserve "the health and genetic diversity of the wild stock native to Florida waters"— strongly suggests that § 68B–21.003(1) is part of a statutory scheme to protect Florida native snook.

■ The absence of any clear extraterritorial language is dispositive here, particularly because the government agreed during oral argument that I should not consider the statute's legislative history in determining its reach. In any event, as the defendants correctly note, the Florida legislature and enacting agencies are presumed to know and legislate consistently with prior judicial decisions. *See Jones v. ETS of New Orleans, Inc.*, 793 So.2d 912, 917 (Fla.2001). As such, the FWCC is presumed to have known that § 68B–21.003(1) was not going to be applied to snook caught outside of Florida unless it included clear and express language to this effect.

Furthermore, while § 68B–21.003(1) is silent as to its extraterritorial reach, the FWCC explicitly provided that other snook regulations were to apply outside of Florida. For example, one regulation states that "the taking or attempted taking of snook *within or without* state waters is prohibited except by use of hook and line gear." *See* § 68B–21.007(1) (emphasis added). Another regulation provides that "what is commonly called snook snatching is prohibited *within or without the waters of this state*." *See* § 68B–21.007(2) (emphasis added). This is another indicia that § 68B–21.003(1) is not intended to apply outside of Florida; the FWCC's use of explicit extraterritorial language in § 68B–21.007(1)–(2) suggests that § 68B–21.003(1)—which does not contain any explicit extraterritorial language—applies only to Florida fish. *See Beach v. Great W. Bank*, 692 So.2d 146, 152 (Fla.1997) (citing *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in disparate inclusion or exclusion.")); *Cason v. Crosby*, 892 So.2d 536, 537 (Fla. 1st DCA 2005) (same).

The government contends that it would be illogical to hold on one hand that the snatching regulations, §§ 68B–21.007(1)–

(2), apply extraterritorially and on the other that those prohibiting the trafficking and possession of snook do not. That may be true. But legislative and administrative agencies do not always act comprehensively or consistently, and can address perceived problems in piecemeal fashion. I am therefore hesitant to second-guess the wisdom or under-inclusiveness of the snook regulations at issue here. I am even more reluctant to rewrite the regulations to make them more logical from the government's perspective. Regardless of whether the regulations make sense as a whole, the fact remains that the FWCC specified that the snatching regulations had extraterritorial application and did not indicate any such intent with respect to the trafficking and possession regulations. It is possible that the FWCC deferred to other states and foreign jurisdictions to decide how to protect their native snook, while prohibiting Florida residents from using non-acceptable methods to catch snook in any jurisdiction. This type of speculation, however, is not necessary in light of the absence of textual support for the extraterritorial application of the trafficking and possession regulations. *See White*, 113 So. at 95.

I also reject the government's suggestion that these provisions were initially enacted to apply to species of snook not found in Florida waters. Again, the extraterritorial application of Florida's snook regulations does not depend on any un-

specified and unarticulated intent to cover foreign snook, but on whether the FWCC explicitly and clearly indicated the regulations' application to foreign-caught fish in the regulatory text.

### B. § 686–21.004(1)

■ The same reasoning applies to § 68B–21.004(1), which provides that "no person, firm, or corporation shall kill, harvest, or have in its possession, regardless of where taken any snook during the following closed periods, in the indicated areas." In essence, § 68B–21.004(1) prohibits three types of activities: (1) the killing, (2) the harvesting, and (3) the possession of snook during three specified seasons and in three geographic areas within Florida.

The first season is the period beginning December 15 of each year and continuing through January 31 of the following year. During this period, the prohibition applies "statewide." *See* § 68B–21.004(1)(a). The second season extends from June to August and covers Florida's "Atlantic Region." *See* § 68B–21.004(1)(b).[4] The third season comprises the first 14 days of December and the months of February, May, June, July, and August. During the third season, the regulations apply only in the "Gulf Region." *See* § 68B–21.004(1)(c).[5]

The government does not dispute that the prohibitions on killing and harvesting snook apply only to Florida waters. Nev-

---

4. The Atlantic Region comprises all state waters of the Atlantic Ocean north and east of the Dade–Monroe County line, and all inland waters of the counties encompassed by the St. Johns Water Management District, and the South Florida Water Management District, except Charlotte County, Collier County, Glades County, Hendry County, Highlands County, Lee County, and Monroe County, but including all waters of Lake Okeechobee and the Kissimmee River. *See* § 68B–21.0015(1).

5. The Gulf Region is defined as all state waters of the Gulf of Mexico, the inland waters of Charlotte County, Collier County, Glades County, Hendry County, Highlands County, Lee County, Monroe County and all counties encompassed by the Southwest Florida Water Management District, the Suwannee River Water Management District, and the Northwest Florida Water Management District, and all waters of the Everglades National Park, but excluding all waters of Lake Okeechobee and the Kissimmee River. *See* § 68B–21.0015(1).

ertheless, the government argues that the prohibitions on *possession* apply to foreign-caught snook. This argument has some superficial appeal when buttressed with the regulation's "regardless of where taken" clause, which can be construed broadly to apply to snook taken outside of Florida waters. Under this construction, the phrase "regardless of where taken" is unqualified, and is intended to facilitate the regulation's enforcement by eliminating unverifiable cries of faux indignance that allegedly contraband snook was not caught in Florida's waters.

The defendants, on the other hand, respond that the "regardless of where taken" clause is qualified by the "indicated areas" clause that follows. Under this construction of the regulation, the "regardless of where taken" clause is read narrowly as to mean "regardless of where taken in the indicated areas." Thus, the defendants' qualified construction of the "regardless of where taken" clause precludes the extraterritorial application of § 68B–21.004(1), as snook caught outside of the indicated areas would not be subject to the regulation. With this interpretation, the defendants reason that the FWCC decided against taking the extreme and draconian measure of imposing an unqualified ban on snook caught internationally, including species of the fish not native to Florida waters.

The government's interpretation of the regulation may correctly effect the FWCC's intent. The defendants, however, present a plausible alternative construction of the text. Given these reasonable competing interpretations of § 68B–21.004(1), both the 'rule of lenity' and the Florida Supreme Court's mandate regarding the extraterritorial application of fishing laws compel the resolution of this conflict in favor of the defendants.

As discussed above, courts cannot give extraterritorial effect to a Florida fishing regulation absent a "clear expression" of the law's application outside of the State's waters. *See, e.g., Se. Fisheries Assoc., Inc.,* 453 So.2d at 1355. Unlike the text of § 68B–21.003(1), the "regardless of where taken" language of § 68B–21.004(1) arguably demonstrates the FWCC's intent that the law apply to foreign-caught fish. Yet laws that have extraterritorial application—including those policing snook—generally contain the "within or without state waters" language expressly sanctioned by the Florida Supreme Court. *See* § 68B–21.007(1) (applying to snook taken *"within or without state waters"*) (emphasis added); § 68B–21.007(2) (applying to "what is commonly called snook snatching ... *within or without the waters of this state"*) (emphasis added); *Millington,* 377 So.2d at 687 (applying extraterritorially Fla. Stat. § 370.15(2)(a), which proscribes possession of undersized shrimp *"within or without the waters of this state"*) (emphasis added). *See also Raffield v. State,* 565 So.2d 704, 705 (Fla.1990) (giving extraterritorial effect to Fla. Stat. § 370.08(3), which provided that "[n]o person may take food fish *within or without the waters of this state* with a purse seine") (emphasis added).

■ That being said, a Florida law need not include the "within or without" term as a prerequisite for a regulation to apply to foreign-caught fish. Indeed, Florida's former statutory scheme regulating possession of undersized crawfish employed the "regardless of where taken" language to give its restrictions extraterritorial effect. *See* Fla. Stat § 370.14 (1973) ("No person, firm, or corporation shall take or have in his possession, *regardless of where taken,* any saltwater crawfish ... during the closed season") (emphasis added), *enforced, Nat'l Fishermen Producers Co-op. Soc'y of Belize City v. State,* 503 So.2d 430, 432 (Fla. 3d DCA 1987). But

unlike the snook regulation here, there was no language in § 370.14 that could be read to qualify the "regardless of where taken" clause, thus rendering its extraterritorial effect clear and unequivocal. When read in context with the "indicated areas" clause, the phrase "regardless of where taken" in § 68B–21.004(1) fails to provide the same clarity, and precludes the straightforward application of the regulation to fish caught outside of Florida waters.

■ Just as applicable state law precedent dictates against extraterritorial enforcement of § 68B–21.004(1), the rule of lenity further compels the same result. Applying this rule in *United States v. Santos*, —— U.S. ——, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008), the Supreme Court construed an ambiguity in the federal money-laundering statutes in favor of the defendants and overturned their convictions. At issue was whether the term "proceeds" as employed throughout the statute meant "receipts" or "profits". *See id.* at 2024. Because the defendants had been convicted for transactions involving the *receipts* of illegal activity that were not the *profits* of that activity, the definition of the term was central to the validity of their convictions. Writing for the majority, Justice Scalia noted that profits and receipts were both accepted synonyms for proceeds, and that the rule of lenity required the resolution of this ambiguity in favor of the defendants. *See id.* at 2025.

■ Although the federal money-laundering statute at issue in *Santos* and the state environmental regulation in the case at bar proscribe entirely distinct realms of conduct, their ambiguities are highly analogous. Because all *profits* of illegal activity are also *receipts* of that activity, but not all receipts are profits, the government's favored interpretation of the term "proceeds" would greatly facilitate prosecution by placing under the ambit of the statute any cash transaction occurring in conjunction with a predicate illegal act. Similarly, the construction of § 68B–21.004(1) advanced by the government in this case takes the phrase "regardless of where taken" to its logical extreme, as to prohibit possession of all snook during closed seasons, including species of the fish that are not found in Florida waters. The government's argument that this broad interpretation is necessary to effect the FWCC's presumptive intent to facilitate enforcement would—as Justice Scalia put it—"turn[ ] the rule of lenity upside-down." *Id.* at 2028. This contention fails because it amounts to an assertion that public policy concerns warrant the judicial expansion of § 68B–21.004(1) beyond the scope explicitly afforded by the agency that drafted it. Courts "interpret ambiguous criminal statutes in favor of defendants, not prosecutors." *Id.* To use a baseball analogy, a tie in statutory construction of a penal law goes to the defendant.[6]

Nor am I persuaded by the government's argument that adopting the defendants' interpretation of § 68B–21.004(1) would destroy its intended effect. The government goes to great lengths to docu-

---

**6.** The rule of lenity applies with equal force in Florida state courts, and to the extent the state prosecuted someone criminally under § 68B–21.004(1), the state court would be required to apply the rule to the regulation. Indeed, "[i]n Florida, the rule is not just an interpretive tool, but a statutory directive." *See Kasischke v. State*, 991 So.2d 803, 814 (Fla.2008) (citing Fla. Stat. § 775.021(1)) ("The provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused."). *See also State v. Byars*, 823 So.2d 740, 742 (Fla.2002) ("Any ambiguity or situations in which statutory language is susceptible to differing constructions must be resolved in favor of the person charged with an offense.").

ment the FWCC's intent that all snook prohibitions apply to foreign-caught fish by detailing the historical necessity of extraterritorial application for environmental protection laws and citing analogous regulations (none of which employ the same language). The simple fact remains, however, that deducing § 68B–21.004(1)'s geographic application requires speculation and guesswork. Even accepting that the extraterritorial application of § 68B–21.004(1) may have a more beneficial effect, the FWCC's unexpressed will is not a relevant consideration:

> From this review of the examination made of the act at the bar, it appears that the argument chiefly relied on, to prove that the words of one section descriptive of the place ought to be incorporated into another, is the extreme improbability that Congress could have intended to make those differences with respect to place, which their words import. We admit that it is extremely improbable. *But probability is not a guide which a court, in construing a penal statute, can safely take.*

*United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 105, 5 L.Ed. 37 (1820) (Marshall, C.J.) (emphasis added).

Accordingly, the ambiguity in § 68B–21.004(1) must be resolved in favor of the defendants, and I must construe the "indicated areas" clause of the regulation to modify and qualify the term "regardless of where taken." In so doing, I reach the inevitable conclusion that § 68B–21.004(1) has no application to fish caught legally in Nicaragua.

### IV. Conclusion

As a matter of law, the defendants cannot be prosecuted under the Lacey Act for violating §§ 68B–21.003(1) and 68B–21.004(1)(a) of the Florida Administrative Code for possessing or selling snook legally caught in Nicaragua. All charges of the indictment based on these provisions—

Counts 2, 3, and 4, as well as objectives (a) and (b) of the conspiracy charged in Count 1 under 18 U.S.C. § 371—are dismissed with prejudice.